**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

---

**Drewes Farms Partnership**,

                                        Plaintiff,

**State of Ohio**,

                                        Intervenor-Plaintiff,

                                v.

**City of Toledo**,

                                        Defendant.

No. 3:19-cv-00434-JZ

The Honorable Jack Zouhary

**Toledoans for Safe Water's Amicus
Curiae Brief re Motions for
Judgment on the Pleadings**

**TOLEDOANS FOR SAFE WATER'S AMICUS CURIAE BRIEF RE MOTIONS FOR
JUDGMENT ON THE PLEADINGS**

August 15, 2019

## Table of Contents

Table of Authorities.................................................................................................................3

Statement of the Issues.........................................................................................................6

Summary of the Argument....................................................................................................6

Factual Background...............................................................................................................7

Discussion.............................................................................................................................9

   I.  Standard for Judgment on the Pleadings............................................................9

   II.  The people of Ohio possess a fundamental right of local community self-government.......9

    A.  This Court possesses the inherent authority to recognize fundamental constitutional rights.................................................................................................................10

    B.  The right of local community self-government is a fundamental constitutional right deeply rooted in our history and fundamental to our scheme of ordered liberty...............12

   III. Challenges to LEBOR based on corporate constitutional rights and ceiling preemption fail to satisfy strict scrutiny..........................................................................................18

    A.  Application of corporate constitutional rights, Dillon's Rule, and ceiling preemption to the right of local community self-government requires a strict scrutiny standard of review....................................................................................................................19

     1.  The application of corporate constitutional "rights" cannot satisfy strict scrutiny review....................................................................................................................19

     2.  The application of Dillon's Rule cannot satisfy strict scrutiny review..........................20

     3.  The application of ceiling preemption cannot satisfy strict scrutiny review..................22

Conclusion..........................................................................................................................24

Certificate of Memorandum Length....................................................................................26

Certificate of Service..........................................................................................................27

## Table of Authorities

### Cases

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).......................................................................10

*Clajon Prod. Corp. v. Petera*, 70 F.3d 1566 (10th Cir. 1995)........................................................21

*Commonwealth v. McElwee*, 193 A. 628 (Pa. 1937)......................................................................18

*Commonwealth v. Thorpe*, 384 Mass. 271, 424 N.E.2d 250 (1981)..............................................13

*Commonwealth vs. Blood*, 400 Mass. 61, 507 N.E.2d 1029 (1987)..............................................13

*Duncan v. Louisiana*, 391 U.S. 145 (1968)...................................................................................11

*Envtl. Law & Policy Ctr. v. U.S. E.P.A.*, Order on Oct. 3, 2018 (N.D. Ohio, No. 3:17-cv-1514)......9

*Ex parte Lewis*, 73 S.W. 811, 817-18 (Tx. Cr. App. 1903)............................................................17

*Federal Gas & Fuel Co. v. City of Columbus*, 118 N.E. 103, 105 (Ohio 1917).......................17, 19

*Griswold v. Connecticut*, 381 U.S. 479, 493 (1965)..................................................................11-12

*Helena Consol. Water Co. v. Steele*, 49 P. 382 (Mont. 1897).......................................................17

*Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603 (6th Cir. 2009)........................................................10

*JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577 (6th Cir. 2007)...........................................10

*Juliana v. United States*, 217 F. Supp. 3d 1224 (D. Or. 2016)......................................................11.

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010)...........................................................11, 19

*Moore v. City of East Cleveland*, 431 U.S. 494 (1997)..................................................................12

*Nat'l W. Life Ins. Co. v. Commodore Cove Improvement Dist.*, 678 F.2d 24 (5th Cir. 1982)..........21

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015)..............................................................................12

*Paul v. Virginia*, 75 U.S. 168 (1868)...........................................................................................21

*People ex rel. Le Roy v. Hurlbut*, 24 Mich. 44 (1871)..............................................................16, 18

*People v. Lynch*, 51 Cal. 15 (1875)..............................................................................................16

*Rathbone v. Wirth*, 45 N.E. 15 (N.Y. 1896)..................................................................................17

*Redell v. Moores*, 88 N.W. 243 (Neb. 1901).................................................................................17

*Richards v. Thurston*, 304 F. Supp. 449 (D. Mass. 1969)..................................................22

*Roe v. Wade*, 410 U.S. 113 (1973)..........................................................................20

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973)........................................24

*Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291 (6th Cir. 2008)...........................10

*Snyder v. Massachusetts*, 291 U.S. 97 (1934)..............................................................11

*State ex rel Holt v. Denny*, 21 N.E. 274 (Ind. 1888)......................................................16

*State ex rel. Pearson v. Hayes*, 61 N.H. 264 (1881)......................................................16

*State ex rel. Smyth v. Moores*, 55 Neb. 480, 76 N.W. 175 (Neb. 1898)...........................17

*State v. Barker*, 89 N.W. 204 (Iowa 1902).................................................................17

*State v. Essling*, 195 N.W. 539 (Minn. 1923).............................................................18

*State v. Sieyes*, 168 Wash.2d 276, 225 P.3d 995 (2010).................................................12

*State v. Standford*, 24 Utah 148, 66 P. 1061 (Utah 1901)...............................................17

*Town of Holyoke v. Smith*, 226 P. 158 (Colo. 1924).....................................................18

*Troxel v. Granville*, 530 U.S. 57 (2000)....................................................................12

*United Public Workers v. Mitchell*, 330 U.S. 75 (1947)..................................................11

Washington v. Glucksberg, 521 U.S. 702, 721 (1997).....................................................12

*Weems v. Little Rock Police Dep't*, 453 F.3d 1010 (8th Cir. 2006)...................................21

**Constitutional Provisions**

OHIO CONST. Art. I, § 2....................................................................................11, 16

OHIO CONST. Art. XVIII........................................................................................22

ARTICLES OF CONFEDERATION OF THE UNITED COLONIES OF NEW ENGLAND; May 19, 1643......14

THE DECLARATION OF INDEPENDENCE, 1 U.S.C. i-iii.................................................15

THE DOVER COMBINATION......................................................................................14

FUNDAMENTAL ORDERS of 1639..............................................................................14

VIRGINIA CONST. of 1776......................................................................................16

**Secondary Sources**

COLONIAL ORIGINS OF THE AMERICAN CONSTITUTION: A DOCUMENTARY HISTORY
(Donald S. Lutz ed., 1998)...................................................................................................14

William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*,
90 HARV. L. REV. 489 (1977)............................................................................................12

Paul Alan Cox *et al.*, *Dietary exposure to an environmental toxin triggers neurofibrillary tangles
and amyloid deposits in the brain*, PROC. R. SOC. B. (Jan. 26, 2016).................................8

Amasa M. Eaton, *The Right to Local Self-Government*, 5 parts, 13 HARVARD L. REV. 58, 570, 638
(1899-1900), 14 HARVARD L. REV. 20, 116 (1900-1901)................................................18

Envtl. Working Group and Envtl. Law & Policy Ctr., *Explosion of Unregulated Factor Famrs in
Maumee Watershed Fuels Lake Erie's Toxic Bloom*.........................................................9

Edwin A. Gere, Jr., *Dillon's Rule and the Cooley Doctrine: Reflections of the Political Culture*, 8
J. URBAN HISTORY no. 3, at 271 (May 1982)....................................................................18

Alan Jones, *Thomas M. Cooley and the Michigan Supreme Court: 1865–1885*, 10 AMER. J.
LEGAL HISTORY 97 (1966)..................................................................................................18

Thomas Linzey & Daniel E. Brannen Jr., *A Phoenix From the Ashes: Resurrecting a
Constitutional Right of Local, Community Self-Government in the Name of Environmental
Sustainability*, 8 ARIZ. J. ENVTL. L. & POL'Y 1 (2017)......................................13, 15-16, 18, 22-23

Eugene McQuillin, MUNICIPAL CORPORATIONS § 70, at 152 (1911)................................................14

Eugene McQuillin, *Inherent right of local self-government*, § 4.82 in THE LAW OF MUNICIPAL
CORPORATIONS, 3rd ed., vol. 2 (1996)............................................................................18

Stephen R. Miller, *Community Rights and the Municipal Police Power*,
55 SANTA CLARA L. REV. 674 (2017)................................................................................19

Anwar Hussain Syed, *Sovereign or Vassal?*, in THE POLITICAL THEORY OF AMERICAN LOCAL
GOVERNMENT (1966).......................................................................................................18

Justice Philip A. Talmadge, *The Myth of Property Absolutism and Modern Government: The
Interaction of Police Power and Property Rights*, 75 WASH. L. REV. 857 (2000).........................21

Joan C. Williams, *The Constitutional Vulnerability of American Local Government: The Politics
of City Status in American Law*, 1986 WISCONSIN L. REV. 83.......................................19

Michael Wines, *Behind Toledo's Water Crisis, a Long-Troubled Lake Erie*, THE NEW YORK TIMES
(Aug. 4, 2014).....................................................................................................................8

Toledoans for Safe Water ("Toledoans"), having unsuccessfully attempted to intervene in this case, hereby submits an amicus curiae brief, per the Court's suggestion in ECF No. 23 at 5, responding to the Motions for Judgment on the Pleadings by the State of Ohio, ECF No. 34, and Drewes Farms Partnership, ECF No. 35.

Toledoans agree with the arguments of the City of Toledo, at ECF Nos. 47 and 48, which in themselves are more than sufficient for resolving the case in favor of the City. Below, Toledoans provide additional argument on the power of the City and the people of the City to make laws to defend their rights, health, safety, and welfare. Amicus' arguments support the City's argument that this action "undermine[s] the right of local community self-government established by the City's Charter and the Ohio Constitution." ECF No. 47 at 2 (citation omitted).

### Statement of the Issues

(1) Do the people in Ohio have a fundamental right of local community self-government?

(2) Did the people of Toledo lawfully exercise their right of local community self-government to enact the Lake Erie Bill of Rights ("LEBOR")?

(3) Do challenges to LEBOR based on corporate constitutional rights and ceiling preemption fail under strict scrutiny, as violations of the people's right of local community self-government?

### Summary of the Argument

In defense of the Lake Erie Bill of Rights, Toledoans for Safe Water asks this Court to recognize that the people of Toledo possess a fundamental constitutional right of local community self-government, that the people of Toledo lawfully exercised that right by adopting LEBOR, and that that right would be violated if state ceiling preemption and corporate constitutional rights are used to invalidate LEBOR. Recognition and enforcement of a people's right of local community self-government is not contrary to precedent.

Specifically, Toledoans argue that the right of local community self-government is so deeply rooted in this nation's traditions and history that it is a fundamental constitutional right protected by the Fourteenth Amendment to the United States Constitution and the Ohio Constitution. Toledoans argue that LEBOR – which expands and broadens civil and political rights within the City of Toledo – is a lawful exercise of that fundamental constitutional right. Further, Toledoans argue that the various state and federal legal doctrines asserted in this case to nullify LEBOR– namely, corporate constitutional rights, ceiling preemption, and subordination of the City of Toledo to the inadequate health and safety protections currently provided by the state – violate their self-government right because those doctrines fail to satisfy strict scrutiny.

Accordingly, Toledoans ask this Court to grant the City of Toledo's cross-motion for judgment on the pleadings, for the reasons provided by the City, or, if the Court does not find support for the City's argument and must therefore reach the constitutional issue addressed in this brief, for the reasons herein.

**Factual Background**

In the scorching summer heat of August 2014, nearly half a million people in Toledo, Ohio, were told not to use tap water for drinking, cooking, or bathing for three days because a harmful algae bloom poisoned Lake Erie. Harmful algae blooms on Lake Erie have become a regular phenomenon. They produce microcystin, a dangerous toxin. Microcystin "causes diarrhea, vomiting, and liver-functioning problems, and readily kills dogs and other small animals that drink contaminated water."[1] Scientists have also discovered that harmful algae blooms produce a neurotoxin, BMAA, that causes neurodegenerative illness, and is associated with an increased risk of ALS, and possibly even Alzheimer's and Parkinson's.[2] In 2018, Senior U.S. District Court

---

1   Michael Wines, *Behind Toledo's Water Crisis, a Long-Troubled Lake Erie*, THE NEW YORK TIMES (Aug. 4, 2014).
2   Paul Alan Cox *et al.*, *Dietary exposure to an environmental toxin triggers neurofibrillary*

Judge James G. Carr found that the principal causes of Lake Erie's perennial algae blooms are "phosphorus runoff from fertilizer, farmland manure, and, to a lesser extent, industrial sources and sewage treatment plant discharges." *Envtl. Law & Policy Ctr. v. U.S. E.P.A.*, Order at 1, on Oct. 3, 2018 (N.D. Ohio, No. 3:17-cv-1514) (hereinafter "*ELPC* Order").

Upon statehood, a state obtains title in public trust to navigable waters within its boundaries. Unfortunately, the State of Ohio is failing its duties as trustee of these waters. Between 2005 and 2018, the number of factory farms in the Maumee River watershed, a river that flows into Lake Erie and boasts the largest drainage area of any Great Lakes river, "exploded from 545 to 775, a 42 percent increase. The number of animals in the watershed more than doubled, from 9 million to 20.4 million. The amount of manure produced and applied to farmland in the watershed swelled from 3.9 million tons each year to 5.5 million tons."[3] Additionally, "[t]he amount of phosphorus added to the watershed from manure increased by a staggering 67 percent between 2005 and 2018." *Id.* And, "69 percent of all the phosphorus added to the watershed each year comes from factory farms in Ohio." *Id.*

The American regulatory framework is supposed to protect against phenomena like harmful algae blooms. But, Judge Carr recently described how regulatory laws and agencies in general, and the State of Ohio specifically, have failed to protect Lake Erie. Judge Carr described "Ohio's long-standing, persistent reluctance and, on occasion, refusal, to comply with the [Clean Water Act]." *ELPC* Order at 1. He also wrote that the State's failure to act to protect Lake Erie means "the risk remains that sometime in the future, upwards of 500,000 Northwest Ohio residents will again, as they did in August 2014, be deprived of clean, safe water for drinking,

_____

*tangles and amyloid deposits in the brain*, PROC. R. SOC. B. (Jan. 26, 2016), http://dx.doi.org/10.1098/rspb.2015.2397.

3  Envtl. Working Group and Envtl. Law & Policy Ctr., *Explosion of Unregulated Factor Famrs in Maumee Watershed Fuels Lake Erie's Toxic Bloom*, at https://www.ewg.org/interactive-maps/2019_maumee/ [https://perma.cc/MF4Y-9DB4].

bathing, and other normal and necessary uses." *Id.*

In response to the regulatory framework's failure to stop harmful algae blooms, on February 26, 2019, citizens in Toledo, Ohio, voted to protect Lake Erie by amending their City Charter to include the Lake Erie Bill of Rights. LEBOR "establishes irrevocable rights for the Lake Erie Ecosystem to exist, flourish, and naturally evolve, a right to healthy environment for the residents of Toledo" and "elevates the rights of the community and its natural environment over powers claimed by certain corporations." (LEBOR, Preamble, at ECF No. 1-1) LEBOR passed with 61 percent of the 15,000 Toledoans who voted.

**Discussion**

**I.  Standard for Judgment on the Pleadings**

"Motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) are analyzed under the same de novo standard as motions to dismiss pursuant to Rule 12(b)(6)." *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal citations and quotation marks omitted). However, "a legal conclusion couched as a factual allegation" need not be accepted as true on a motion to dismiss, nor are recitations "of the elements of a cause of action sufficient." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

**II.  The people of Ohio possess a fundamental right of local community self-government.**

The people of Ohio possess a fundamental right of local community self-government. The right is inherent in our scheme of constitutional government, deeply rooted in our nation's history

and tradition, fundamental to our scheme of ordered liberty, and secured to the people by the American Declaration of Independence, U.S. Constitution, and Ohio Constitution. Article 1, Section 2, of the Ohio State Constitution declares: "All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary . . . ." LEBOR is an attempt to alter or reform government. The people of Toledo have deemed it necessary to do so because the current government has failed to protect the people of Toledo's water, a basic necessity of health and life.

### A.  This Court possesses the inherent authority to recognize fundamental constitutional rights.

The Due Process Clause of the Fourteenth Amendment declares that no State shall "deprive any person of life, liberty, or property, without due process of law." Rights protected by the Clause include most of the rights specifically enumerated in the Bill of Rights, along with those unenumerated rights which are "so rooted in the traditions and conscience of our people as to be ranked as fundamental."[4]

The United States Supreme Court has explained that "when considering whether a right is a fundamental right, the court [must] look to whether it is a right 'deeply rooted in this nation's history and tradition'" or one which is "fundamental to our scheme of ordered liberty[.]" *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767 (2010); *Griswold v. Connecticut*, 381 U.S.

---

4  *See Duncan v. Louisiana*, 391 U.S. 145, 147-149 (1968); *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934). The Supreme Court has also declared that "the Ninth Amendment simply lends strong support to the view that the 'liberty' protected by the Fifth and Fourteenth Amendments from infringement. . . is not restricted to rights specifically mentioned in the first eight amendments." *United Public Workers v. Mitchell*, 330 U.S. 75, 94-95 (1947). Courts have also recognized that unenumerated fundamental rights "may draw on more than one Constitutional source. The idea is that certain rights may be necessary to enable the exercise of other rights, whether enumerated or unenumerated." *Juliana v. United States*, 217 F. Supp. 3d 1224 (D. Or. 2016) (holding that a "right to a liveable climate" is a fundamental constitutional right).

479, 493 (1965) (Brennan, J., concurring) (courts look to "traditions and (collective) conscience of our people to determine whether a principle is so rooted" there "as to be ranked as fundamental.") (citations omitted).[5]

Applying these well-settled principles of constitutional interpretation, the Supreme Court has decided that the right to marry, the right to establish a home and bring up children, the right of privacy, and the right to intrastate travel are "unenumerated" fundamental constitutional rights protected by the "liberty" interests of the U.S. Constitution. *See, e.g., Troxel v. Granville*, 530 U.S. 57, 65-67 (2000) (interest of parents in the care, custody, and control of their children is a fundamental liberty interest).

As explained by Justice Kennedy in *Obergefell v. Hodges*, in which the Court declared that same-sex marriage is a fundamental liberty protected by the Clause, "[t]he identification and protection of fundamental rights is an enduring part of the judicial duty to interpret the Constitution. . . . History and tradition guide and discipline this inquiry but do not set its outer boundaries." 135 S. Ct. 2584, 2598 (2015).

In addition to this jurisprudence on fundamental rights, another body of jurisprudence upholds the authority of people – acting through their state constitutions – to expand existing federally-guaranteed constitutional rights at the state level.[6] This means federal constitutional rights are floors, not ceilings. The people of a state may secure and enforce state constitutional

---

5  *See also Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1997) ("Appropriate limits on substantive due process come not from drawing arbitrary lines but rather from careful 'respect for the teachings of history (and), solid recognition of the basic values that underlie our society'") (quoting *Griswold*, 381 U.S. at 501 (Harlan, J., concurring)); *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (declaring that "[o]ur Nation's history, legal traditions, and practices thus provide the crucial guideposts for responsible decisionmaking" that direct the court's recognition and enforcement of constitutional guarantees) (citation omitted).

6  *See* William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 HARV. L. REV. 489 (1977); *State v. Sieyes*, 168 Wash.2d 276, 292, 225 P.3d 995 (2010) ("Supreme Court application of the United States Constitution establishes a floor below which state courts cannot go to protect individual rights. But states of course can raise the ceiling and afford greater protections under their own constitutions.").

rights stronger than their federal counterparts, and may secure additional rights not enumerated in the federal constitution. This body of law provides a framework for modeling a contemporary jurisprudence for the right of local community self-government.[7] Under such a jurisprudence, local laws that expand rights, health, and safety protections should be immune from state ceiling preemption, just as greater rights protections in the state constitution are not preempted by the federal constitution.

### B. The right of local community self-government is a fundamental constitutional right deeply rooted in our history and fundamental to our scheme of ordered liberty.

Self-government is the keystone of the American experiment. Local community self-government was exercised in this country for well over a century before creation of either state governments or the national government. These local governments often organized and operated by the people's own volition, without express authority from any centralized power, and often contrary to such power's wishes. As such, the right of self-government was one of the basic, fundamental values upon which this country was founded.

This history began over a hundred and fifty years before the Declaration of Independence, when American colonists aboard the Mayflower entered into the nation's first constitution, the Mayflower Compact. In addition to creating a "civil body politic," the Compact secured the lawmaking authority of the colonists, to "enact, constitute, and frame. . . just and equal laws [and] ordinances."[8] That self-organized government laid the foundation for the first settlements in New England where residents joined together to create governments for their own towns and colonies

---

7  *See, e.g., Commonwealth vs. Blood*, 400 Mass. 61, 71, 507 N.E.2d 1029, 1035 (1987); *see also Commonwealth v. Thorpe*, 384 Mass. 271, 286, 424 N.E.2d 250, 259 (1981) (applying Article 14 of the Massachusetts Constitution as providing greater privacy protections than the Fourth Amendment to the United States Constitution).

8  *See* Thomas Linzey & Daniel E. Brannen Jr., *A Phoenix From the Ashes: Resurrecting a Constitutional Right of Local, Community Self-Government in the Name of Environmental Sustainability*, 8 ARIZ. J. ENVTL. L. & POL'Y 1, 9–10 (2017).

through the exercise of their own authority to self-govern.[9]

In the 1620s, early colonists founded settlements in New Hampshire that became the towns of Portsmouth and Dover. Both were "wholly self-ruled," and Dover's inhabitants self-organized into a "body politique … with all such laws as shall be concluded by a major part of the Freemen of our Society."[10] In 1639, the settlers of Exeter, New Hampshire, created their own government, declaring in the Exeter Compact that "[we] combine ourselves together to erect and set up among us such Government. . . according to the libertyes of our English colony of Massachusetts."[11] Also in 1639, residents of Windsor, Hartford, and Wethersfield joined together to adopt the "Fundamental Orders of Connecticut," the first written state constitution in America, which secured self-governance within those towns.[12] In 1643, colonists joined together to create the United Colonies of New England by approving the Articles of Confederation for the United Colonies, therein declaring that the people of each plantation, town, and colony shall have "exclusive jurisdiction and government within their limits," and thereby securing their authority to self-govern locally.[13]

---

9   *See*, *e.g.*, 1 Eugene McQuillin, MUNICIPAL CORPORATIONS § 70, at 152 (1911) ("in this country from the beginning, political power has been exercised by citizens of the various local communities as local communities, and this constitutes the most important feature in our system of government."), *and* at 156 ("local self-government of the municipal corporation does not spring from, nor exist by virtue of, written constitutions, nor is it a mere privilege conferred by the central authority. . . [T]he people of the various organized communities exercise their rights of local self-government under the protection of these fundamental principles which were accepted, without doubt or question, when the several state constitutions were promulgated.").

10  *The Dover Combination*, Dover Public Library, http://www.dover.nh.gov/government/city-operations/library/history/the-dover-combination.html [https://perma.cc/ZQ8B-PPB7] (signed by the founders of Dover, New Hampshire in 1640).

11  COLONIAL ORIGINS OF THE AMERICAN CONSTITUTION: A DOCUMENTARY HISTORY 26 (Donald S. Lutz ed., 1998).

12  *See Fundamental Orders of 1639, available at* The Avalon Project, http://avalon.law.yale.edu/17th_century/order.asp [https://perma.cc/D3C2-PQQW].

13  *See Articles of Confederation of the United Colonies of New England; May 19, 1643, available at* The Avalon Project, http://avalon.law.yale.edu/17th_century/art1613.asp [https://perma.cc/NV56-975R].

This history of local self-government eventually clashed with British authority over the American colonies. As a result, revolutionary lawyers transformed the colonists' historical practice of self-government into a legal doctrine. Specifically, in response to the assertion of British authority to enter residences without advance notice or probable cause, attorney James Otis first asserted that British authority was invalid because only the people had the authority to adopt laws governing themselves.[14]

The right of local self-government thus became a central tenet in the American Revolution. From the adoption of the Currency Acts and the Stamp Act in 1764-65, through the adoption of the Tea Act in 1773, colonial opposition to British laws focused on those Acts' violation of the right of the colonists to local self-government. In response, the British Parliament dissolved Town Meetings in New England in an effort to prevent local self-government from being exercised.[15]

Colonial resistance heightened still, with the adoption of local declarations of independence by ninety towns, villages and counties, and the Declaration of Rights by the Virginia legislature.[16] Building upon this local groundswell, Congress adopted a national Declaration of Independence in 1776. Primary reasons for severance from Great Britain included the "taking away our Charters, abolishing our most valuable laws and altering fundamentally the Forms of our Governments."[17] The Declaration thus unequivocally set forth the guarantee of local self-government – that governments owe their existence to and derive their powers exclusively from "the consent of the governed," that the primary purpose of governments is "to secure" the people's "unalienable Rights," and that "whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or abolish it." *Id.*

James Madison proposed to write the Declaration's principles of local self-government

14  *See* Linzey, *supra* note 8, at 11-12.
15  *See id.* at 12-16.
16  *See id.* at 16-18.
17  THE DECLARATION OF INDEPENDENCE, 1 U.S.C. i-iii.

directly into the U.S. Constitution, but other framers argued that the right was so implicitly fundamental to the new nation that it was unnecessary to explicitly include it.[18] They won the argument, but history has since proven them wrong. State ratifying conventions had forced that conversation to occur in Congress, as a majority of the populations of those states either rejected the Constitution outright, or conditioned their approval on the placement of the Declaration's principles directly into the Constitution.[19]

The people of every state have included the Declaration's principles of the right of local self-government in every state constitution.[20] And the people of several states have explicitly recognized the authority of a "majority of the community" to "reform, alter, or abolish" their governmental system.[21] Ohio among them.[22] Beginning in 1857, the United States Congress used Enabling Acts to require that all new state constitutions contained similar provisions.[23]

In addition to the textual guarantees in state constitutions, the state supreme courts of at least fourteen states have not only declared that an inherent right of local self-government exists, but have acted to enforce that right; only one of these fourteen decisions has been overturned.[24]

---

18 *See* Linzey, *supra* note 8, at 24-28.

19 *See id.* at 25 n.77.

20 *See id.* at 19-24.

21 *See, e.g.*, VIRGINIA CONST. OF 1776, § 4.

22 OHIO CONST. Art. I, § 2 ("All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary; and no special privileges or immunities shall ever be granted, that may not be altered, revoked, or repealed by the General Assembly.").

23 *See* Linzey, *supra* note 8, at 22.

24 *People ex rel. Le Roy v. Hurlbut*, 24 Mich. 44, 108 (1871) (Cooley, J., concurring) ("Local government is a matter of absolute right; and the state cannot take it away"); *People v. Lynch*, 51 Cal. 15, 27 (1875) (holding that the right of local self-government is implied in our constitutions by the Tenth Amendment); *State ex rel. Pearson v. Hayes*, 61 N.H. 264, 322 (1881) ("Local self-government (including much administration of law, and the extensive use of the law-making powers of taxation and police), introduced not only before the organization of both the state and province of New Hampshire, but also before the extension of Massachusetts jurisdiction to the Piscataqua, and continuing in uninterrupted operation more than two hundred years, has been constitutionally established by recognition and usage."); *State ex rel Holt v. Denny*, 21 N.E. 274, 277-78 (Ind. 1888) ("As we interpret the theory of our

Ohio is one of the thirteen states whose precedent on this right survives and is applicable today. In

*Federal Gas & Fuel Co. v. City of Columbus*, 118 N.E. 103, 105 (Ohio 1917), the court said:

> I want here and now to challenge the doctrine that municipalities have ever been mere creatures of the General Assembly . . . .

> The historical fact is that we had a hundred and more municipalities in Ohio already in existence at the time of the adoption of our first Constitution, in 1802, which were many times multiplied at the time of the adoption of the second Constitution, in 1851.

State government, this right of local self-government, vested in, exercised and enjoyed by, the people of the municipalities of the State at the time of the adoption of the Constitution, yet remains in them, unless expressly yielded up and granted to one of the branches of the State government by the Constitution"); *Rathbone v. Wirth*, 45 N.E. 15, 17 (N.Y. 1896) (the right of local self-government "inheres in a republican government and with reference to which our Constitution was framed…. [A]s Judge Cooley has remarked with reference to the Constitutions of the states, 'if not expressly reserved, it is still to be understood that all these instruments are framed with its present existence and anticipated continuance in view.'" (citation omitted)); *Helena Consol. Water Co. v. Steele*, 49 P. 382, 386 (Mont. 1897) ("We think the two provisos of the law under discussion are in violation of the clauses of the constitution quoted and referred to above, as well as the spirit of our governmental system, which recognizes 'that the people of every hamlet, town, and city of the state are entitled to the benefits of local self-government.'" (citation omitted)); *State ex rel. Smyth v. Moores*, 55 Neb. 480, 76 N.W. 175, 179 (Neb. 1898) ("It cannot be successfully asserted that the only rights reserved to the people are those enumerated in said article of the constitution, since section 26 thereof declares, 'This enumeration of rights shall not be construed to impair or deny others, retained by the people, and all powers not herein delegated, remain with the people.' This language removes all doubt that powers other than those specified in the bill of rights were retained by the people, and any statute enacted in violation of such rights is as clearly invalid as though the same had been expressly forbidden by the fundamental law. . . . [I]t is very evident that the constitution was framed upon the theory of local self-government."), *overruled by Redell v. Moores*, 88 N.W. 243 (Neb. 1901); *State v. Standford*, 24 Utah 148, 66 P. 1061 (Utah 1901) ("[T]he Constitution implies a right of local self-government to each county . . . ."); *State v. Barker*, 89 N.W. 204, 207 (Iowa 1902) (Observing that "written constitutions should be construed with reference to and in the light of well-recognized and fundamental principles lying back of all constitutions, and constituting the very warp and woof of these fabrics."); *Ex parte Lewis*, 73 S.W. 811, 817-18 (Tx. Cr. App. 1903) ("We do not understand that the constitution grants power which is not expressly reserved to the legislative body of the government. This is reserved to the people. Only the law-making power belongs to the legislature, and this must be in accordance with the principles of local self-government reserved to the people of the state, because the constitution says that all political power is inherent in the people, not in the legislature, and the right of local self-government is reserved to the state…. The Legislature is the law-making power, and to it alone is reserved the authority to make laws; but it has not right under the guise of its law-making authority to overturn the principles of local self-government which have been handed down to us from our fathers."); *Federal Gas & Fuel Co. v. City of Columbus*, 118 N.E. 103, 105 (Ohio 1917) ("If all political power is inherent in the people, as written in our Constitution, for the government

> All were then exercising local self-government. The constitutional fathers did not even mention municipalities or cities in the first Constitution, and in the second Constitution granted to the General Assembly certain power to restrict, from all of which it would seem a mere legal and constitutional axiom that they never granted, nor intended to grant, to the General Assembly of Ohio the general guardianship of all municipalities.

> If all political power is inherent in the people, as written in our Constitution, for the government of the state, it would seem at least of equal importance that all political power should be inherent in the people for the government of our cities and villages, and so it seemed to men like Thurman, Ranney, Cooley, and Campbell, than whom there have been few greater in American jurisprudence. I prefer to follow their course of reasoning, based upon historical fact and political principles, rather than the mere dictums and dogmas of decisions holding that municipal government is government by the General Assembly.

> . . .

> If it be important that the world be made 'safe for democracy' in the government of nations, it would seem at least of equal importance to the people of Ohio that our state shall be made safe for democracy in the government of our municipalities, for these constantly touch us in our everyday life.

Building on both the textual guarantees in federal and state constitutions and the judicial precedent applying them, jurists and legal commentators have written extensively in favor of the constitutional basis of the right of local community self-government.[25]

---

of the state, it would seem at least of equal importance that all political power should be inherent in the people for the government of our cities and villages."); *State v. Essling*, 195 N.W. 539, 541 (Minn. 1923) ("The doctrine that local self-government is fundamental in American political institutions; that it existed before the states adopted their Constitutions, and that it is more than a mere privilege conceded by the Legislature in its discretion is ably discussed in *People v. Hurlbut*."); *Town of Holyoke v. Smith*, 226 P. 158, 158 (Colo. 1924) ("The central idea of government in this country was and is that in local matters municipalities should be self-governing."); *Commonwealth v. McElwee*, 193 A. 628, 630 (Pa. 1937) ("In analyzing this act preparatory to determining whether or not it trenches upon the Constitution, one is impressed with the fact that it violates the principle of 'home rule,' i.e., local self-government, which, like the tripartite separation of governmental powers, is a vital part of both the foundations and general framework of our state and federal governments.").

25 *See, e.g.*, Linzey, *supra* note 8; Amasa M. Eaton, *The Right to Local Self-Government*, 5 parts, 13 HARVARD L. REV. 58, 570, 638 (1899-1900), 14 HARVARD L. REV. 20, 20, 116 (1900-1901); Edwin A. Gere, Jr., *Dillon's Rule and the Cooley Doctrine: Reflections of the Political Culture*, 8 J. URBAN HISTORY no. 3, at 271 (May 1982); Alan Jones, *Thomas M. Cooley and the Michigan Supreme Court: 1865–1885*, 10 AMER. J. LEGAL HISTORY 97 (1966); Eugene McQuillin, *Inherent right of local self-government*, § 4.82 in THE LAW OF MUNICIPAL CORPORATIONS, 3rd ed., vol. 2 (1996); Anwar Hussain Syed, *Sovereign or Vassal?*, in THE

In sum, securing local self-governance was a critical cause for British settlement in America, the reason for the American Revolution, the cornerstone of the Declaration of Independence, the fundamental premise of every state constitution, and the guiding ideal for the phrase "we the people" in the United States Constitution, being pivotal to state ratification of that federal document. As a cornerstone securing civil and political "liberty" pursuant to the Fifth and later Fourteenth amendments, it constitutes one of the bedrock values of the American system of government. It is, without a doubt, a value "deeply rooted in this nation's history and tradition" and one which is "fundamental to our scheme of ordered liberty[.]" *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767 (2010). And it is expressly recognized by binding precedent from the Ohio Supreme Court. *Federal Gas & Fuel Co. v. City of Columbus*, 118 N.E. 103, 105 (Ohio 1917). This Court, therefore, must adhere to this history and precedent by recognizing the right of local community self-government as a fundamental constitutional right.

### III.    Challenges to LEBOR based on corporate constitutional rights and ceiling preemption fail to satisfy strict scrutiny.

In this action, the Plaintiff Drewes Farms Partnership ("DFP") and Intervenor-Plaintiff State of Ohio make several claims. Each can be grouped into one of three categories, with each category representing a separate legal doctrine which DFP and the State seek to enforce against LEBOR. First, claims that LEBOR violates the corporation's constitutional "rights" rest on the doctrine that corporations have the same rights as "persons" pursuant to the federal Bill of Rights, and that they are thereby entitled to other rights contained within the body of the Constitution as well. *See* Complaints, ECF No. 1, § 6; ECF No. 35-1. Second, allegations that LEBOR is void because the City lacked the state's express authority to adopt LEBOR rest on the doctrine of

POLITICAL THEORY OF AMERICAN LOCAL GOVERNMENT (1966); Joan C. Williams, *The Constitutional Vulnerability of American Local Government: The Politics of City Status in American Law*, 1986 WISCONSIN L. REV. 83; Stephen R. Miller, *Community Rights and the Municipal Police Power*, 55 SANTA CLARA L. REV. 674 (2017).

Dillon's Rule, which proscribes municipal lawmaking not expressly authorized by the state. *See* Ohio's Complaint, ECF No. 35, Counts IV-VI. Third, claims that the city was foreclosed from adopting LEBOR because of conflicting state laws rest on the doctrine of state "ceiling" preemption, which says a municipal law, even if allowed in the first place under Dillon's Rule, cannot exceed standards established by state law. *Id.*

**A.    Application of corporate constitutional rights, Dillon's Rule, and ceiling preemption to the right of local community self-government requires a strict scrutiny standard of review.**

As a fundamental constitutional right, the right of local community self-government cannot be infringed unless the most stringent standard of constitutional review is satisfied, strict scrutiny. That review requires that there be a compelling governmental interest, that the law be narrowly tailored to achieve that interest, and that the law be the least restrictive means for achieving that interest. *Roe v. Wade*, 410 U.S. 113, 155-156 (1973).

Neither the bestowal of constitutional "rights" onto the corporate form, nor municipal subordination to the state in the form of Dillon's Rule, nor ceiling preemption, can satisfy that strict scrutiny standard of review. The claims based on those three legal doctrines must, therefore, be dismissed.

**1.    The application of corporate constitutional "rights" cannot satisfy strict scrutiny review.**

DFP invokes corporate constitutional rights and argues that LEBOR interferes with DFP's First Amendment rights, Equal Protection rights, and Due Process rights. But, these invocations infringe on the people of Toldeo's fundamental right of local community self-government and cannot survive strict scrutiny review.

As shown above, the right of local community self-government right is a fundamental right, specifically of a *political* character. Given this, a governmental interest that infringes on the

right by conferring and enforcing corporate constitutional "rights" cannot be compelling, for two reasons. First, under the Privileges and Immunities Clause, it is well-established that corporations are not citizens. *Paul v. Virginia*, 75 U.S. 168, 177-78, 182 (1868). As corporations are not citizens, allowing their rights to infringe the necessarily superior rights of citizens would elevate the created over the creator. In other words, it would render government of the people subservient to its chartered creations. There can be no compelling governmental interest in subverting itself.

Second, corporations are a form of organized property, owned by their shareholders and managed by their directors and officers. Property rights are not "fundamental" under our constitutions.[26] Government only needs a rational basis to infringe property rights.[27] There is no compelling governmental interest to protect property rights that themselves are subject only to rational basis scrutiny when infringed.

The doctrine of corporate constitutional "rights," when used to strike a local law enacted under the right of local community self-government that expands the people's rights, health, safety, and welfare, infringes the people's right of self-government without being necessary to serve a compelling state interest, nor narrowly-tailored were a compelling interest present, and thus the application of that doctrine must yield to the self-government right.

### 2.    The application of Dillon's Rule cannot satisfy strict scrutiny review.

Dillon's Rule says that a municipality may not enact legislation unless expressly

---

26  *See, e.g.*, *Weems v. Little Rock Police Dep't*, 453 F.3d 1010, 1015-16 (8th Cir. 2006) (holding that right to acquire, enjoy, own, and dispose of property did not implicate a fundamental right); *see also* Justice Philip A. Talmadge, *The Myth of Property Absolutism and Modern Government: The Interaction of Police Power and Property Rights*, 75 WASH. L. REV. 857 (2000).

27  *E.g.*, *Clajon Prod. Corp. v. Petera*, 70 F.3d 1566, 1580 (10th Cir. 1995) (holding that economic regulations have traditionally been afforded only rational relation scrutiny); *Nat'l W. Life Ins. Co. v. Commodore Cove Improvement Dist.*, 678 F.2d 24, 26 (5th Cir. 1982) ("The right freely to alienate real property is not a 'fundamental right' that calls for application of strict scrutiny.").

authorized by the state.[28] Though the State does not use the specific term "Dillon's Rule," it argues that LEBOR exceeds municipal authority and/or state preemption under the Ohio Constitution and claims "A municipal corporation, like the City of Toledo, may only exercise the rights granted under Art. XVIII of the Ohio Constitution or otherwise delegated by the State." ECF No. 31, § 165.

The State's argument under Dillon's Rule cannot survive strict scrutiny review, however, for two reasons. First, the right of local community self-government, like all political and civil rights, belongs to the people naturally, not to the municipal corporation. A state doctrine concerning what municipal corporations may do fails to recognize that when the people exercise their right of local community self-government, they are not subject to state-imposed limitations on what the municipality, as a subdivision of the state, may do.

Second, as already noted, satisfaction of strict scrutiny first requires identification of a compelling governmental interest. Dillon's Rule applies as a blanket rule, regardless of the subject of local lawmaking. This means the absence of state authorization for local legislation, which is the core of this doctrine, is not related to the subject of local legislation at issue in a particular case. So the government's interest for Dillon's Rule can have nothing to do with any particular subject of lawmaking or related public policy. Thus, the only "compelling interest" that could be advanced by the State would be uniformity of the law on municipal authority.

Uniformity here means the State desires a general rule that local communities are limited to legislating in matters of health, safety, and welfare only in particular ways that are authorized by the state. But uniformity for its own sake cannot serve as a rationale or a justification, let alone a compelling one.[29] Otherwise, the mere desire for uniformity could eliminate local governments

---

28 *See* Linzey, *supra* note 8, at 47-49.
29 *Richards v. Thurston*, 304 F. Supp. 449, 454 (D. Mass. 1969) *aff'd*, 424 F.2d 1281 (1st Cir. 1970) (declaring, as part of its examination of a compelling state interest, that "[s]tanding alone, conformity *per se* is neither a reason or a justification. . . uniformity for its own sake. . .

entirely, as states could declare that local variations in health, safety, and welfare lawmaking lack uniformity and therefore are forbidden. If we accept that rational for why the state can control localities, then it would follow that the federal government's desire for uniformity could justify eliminating states. For the same reason, the State's plenary deprivation of local lawmaking authority cannot be deemed to be "narrowly tailored" or "least restrictive," because it is, inherently, a blanket rule that applies to all municipal lawmaking.

In short, the mere desire for uniformity, untethered to a particular governmental policy to protect a particular public interest, is not compelling enough to justify the infringement of a people's inherent right to legislate locally for the protection of their political and civil rights, or their health, safety, and welfare. Therefore, the requirement of state legislative authority for the enactment of local laws infringes the right of local community self-government without being necessary to serve a compelling state interest, and so must yield to that right.

**3.      The application of ceiling preemption cannot satisfy strict scrutiny review.**

The State claims that "[t]he Ohio Constitution limits municipalities like Toledo in their exercise of their police powers to enact and enforce local regulations so long as they not conflict with Ohio's general laws." ECF No. 31, § 167. This is an invocation of ceiling preemption. Ceiling preemption says that a municipal law may not impose health, safety, or welfare standards more stringent than those imposed by state law.[30] Ceiling preemption cannot survive strict scrutiny review, for three reasons. As in the strict scrutiny analysis for Dillon's Rule, the interest of statewide uniformity – by itself – fails to supply a "compelling state interest." *See supra* at 19-20. A state's desire to have either no standard, or just a single maximum for health, safety, and welfare protections, is not compelling enough to justify infringing upon the people's inherent right to

_____

is not a reason in and of itself").

30  *See* Linzey, *supra* note 8, at 52.

legislate more stringent standards locally. In short, uniformity, though convenient for industry, commerce, and other businesses, is not compelling enough to force a community to accept threats to rights, including to health, safety, and welfare, that it finds unacceptable.

So, second, the analysis for this strict scrutiny test becomes fact-specific. For example, does the state have a compelling state interest in promoting and exclusively regulating the number of concentrated animal feeding operations in a watershed, or a compelling state interest in promoting and exclusively regulating the amount of phosphorus runoff leaking into Lake Erie? If the answer is yes, the inquiry must then determine whether the state's interest is superior to the public health and environmental protections codified by the municipal law. This inquiry mirrors the one undertaken to determine whether the municipal community had a "rational basis" for adopting the law.[31] In other words, if the state has one set of standards, and the community has a more stringent set, and the community's standards are rationally related to protecting health, safety, and welfare, there is no legitimate way to assert that the state's interest is superior.

Third and finally, this strict scrutiny analysis must contend with the doctrine that people of one government may expand rights and protections thereof to be stronger than the corresponding rights and protections at another level of government. *See supra* at 9-10. Floor preemption is consistent with a federalism in which the federal, state, and local governments all may legislate to protect rights and health, safety, and welfare. But ceiling preemption, in which one level of government gets to dictate the upper limit of rights and protections for all governments with jurisdiction over a given people, is not consistent with such a federalism. In other words, the right of local self-government necessarily means that there is no compelling interest for one

---

31 A "rational basis" standard of review would normally be used to examine whether a law is valid absent the infringement of a fundamental right. *See, e.g.*, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 40 (1973) (explaining the test requires only that a law "be shown to bear some rational relationship to legitimate state purposes."). Under this scenario, the reasons supporting rationality would be applied to gauge the validity of the state's advancement of a compelling state interest.

government to limit the manner in which the people of another government secure their rights and protect their health, safety, and welfare. A government's compelling interest is only in ensuring that another level of government not erode rights and protections for the people.

In sum, because the State has no compelling interest in acting to set the ceilings for rights, health, safety, and welfare in any field of law, application of ceiling preemption fails to satisfy strict scrutiny.

Here, the Lake Erie Bill of Rights, as part of the Toledo City Charter – the city's constitution – expands rights, health, safety, and welfare protections for the people of Toledo and the Lake Erie Ecosystem. One charter provision recognizes "Lake Erie, and the Lake Erie watershed, possess the right to exist, flourish, and naturally evolve." LEBOR, § 1(a) (at ECF No. 1-1). The next provision provides "The people of the City of Toledo possess the right to a clean and healthy environment, which shall include the right to a clean and healthy Lake Erie and Lake Erie ecosystem." LEBOR, § 1(b). These provisions do not lower the environmental protection standards already established in state and federal law. Instead, they expand protections in the locality. The people of Toledo's self-government right requires that they have the power to decide whether to go above the regulatory floor that the state sets. Here, they did that, and they cannot lawfully be preempted for doing so.

## Conclusion

The people of Toledo enacted the Lake Erie Bill of Rights after experiencing the existing system of law's inability to adequately protect Lake Erie and all those who depend on her for life. They saw that the existing system of law – constrained by the legal doctrines asserted by DFP and the State in this action – fails to provide the most basic constitutional guarantees required of American governments. Those guarantees include the right to governments that recognize the authority of the people to govern their own localities, and governments capable of securing and

protecting the civil and political rights of the community.

The State consistently fails to protect the people. But worse, here, where the people of Toledo have enacted law to protect themselves when the State has failed to, the State now claims exclusive power to regulate. Governments exist to protect the people. When our system of law allows doctrines like Dillon's Rule and ceiling preemption to be used to nullify more protective local laws without judicial scrutiny, our system tramples on the fundamental purpose of government, by failing to protect the people from their very government. DFP's and the State's Motions for Judgment on the Pleadings should be denied, and the City's cross-motion granted.

Respectfully submitted this August 15, 2019.

**/s/ Terry J. Lodge**
Terry J. Lodge, Esq. (S.Ct. #0029271)
316 N. Michigan St., Suite 520
Toledo, OH 43604-5627
Phone (419) 205-7084
tjlodge50@yahoo.com
lodgelaw@yahoo.com

**/s/ Lindsey Schromen-Wawrin**
Lindsey Schromen-Wawrin (WSBA #46352)
Shearwater Law PLLC
306 West Third Street
Port Angeles, WA 98362
Phone (360) 406-4321
Fax (360) 752-5767
lindsey@ShearwaterLaw.com

*Attorneys for Amicus Curiae Toledoans for Safe Water, Inc.*

**Certificate of Memorandum Length**

Pursuant to Local Rule 7.1(f), this brief does not exceed 20 pages.

Dated: August 15, 2019.

**/s/ Terry J. Lodge**
Terry J. Lodge, Esq. (S.Ct. #0029271)
316 N. Michigan St., Suite 520
Toledo, OH 43604-5627
Phone (419) 205-7084
tjlodge50@yahoo.com
lodgelaw@yahoo.com

**/s/ Lindsey Schromen-Wawrin**
Lindsey Schromen-Wawrin (WSBA #46352)
Shearwater Law PLLC
306 West Third Street
Port Angeles, WA 98362
Phone (360) 406-4321
Fax (360) 752-5767
lindsey@ShearwaterLaw.com

*Attorneys for Amicus Curiae Toledoans for Safe Water, Inc.*

**Certificate of Service**

I certify that I electronically filed this document with the Clerk of the Court for the United States District Court for the Northern District of Ohio by using the Court's CM/ECF system. The other parties are Filing Users and are served electronically by the Notice of Docket Activity.


Dated: August 15, 2019

> **/s/ Lindsey Schromen-Wawrin**
> Lindsey Schromen-Wawrin (WSBA #46352)
> Shearwater Law PLLC
> 306 West Third Street
> Port Angeles, WA 98362
> Phone (360) 406-4321
> Fax (360) 752-5767
> lindsey@ShearwaterLaw.com
>
> *Attorney for Amicus Curiae Toledoans for Safe Water, Inc.*